IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| THERMA-FLITE, INC. | § | Case No. 16-33469 |
| THERMA-FLITE MANUFACTURING, LLC, | § | Case No. 16-33470 |
| THERMA-FLITE TX, INC, | § | Case No. 16-33471 |
| THERMA-FLITE INDUSTRIAL, INC, and | § | Case No. 16-33473 |
| THERMA-FLITE HOLDINGS, INC, | § | Case No. 16-33474 |
| | § | |
| Debtors. | § | (Chapter 7 Cases) |
| | § | |

## CFC, INC.'S MOTION FOR SUBSTANTIVE CONSOLIDATION

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

COMES NOW CFC, Inc. ("CFC"), a secured creditor of debtors Therma-Flite, Inc. ("T-F Inc."), Therma-Flite Manufacturing, LLC ("T-F Manufacturing"), and their affiliated debtors, and hereby files this *Motion for Substantive Consolidation* of the above-captioned cases, respectfully stating as follows:

## I.     PROCEDURAL BACKGROUND

1.      On July 8, 2016, (the "Petition Date"), T-F Inc., T-F Manufacturing, Therma-Flite TX, Inc. ("T-F TX"), Therma-Flite Industrial, Inc. ("T-F Industrial"), and T-F Holdings, Inc. ("T-F Holdings") (each one a "Debtor," and together the "Debtors"), filed their respective voluntary petitions for Chapter 7 relief in accordance with title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, (the "Bankruptcy Code").   Janet Northrop is the duly appointed and acting Chapter 7 Trustee for the estate of T-F Inc. (the "T-F Inc. Trustee").   Eva Engelhart is the duly appointed and acting Chapter 7 Trustee for the estates of T-F Manufacturing, T-F TX, T-F Industrial, and T-F Holdings (the "Manufacturing Trustee") (together with the T-F Inc. Trustee, the "Trustees").

2.      On October 19, 2016, the Court, due to no assets, ruled the estates of T-F TX and T-F Industrial closed [Docket No. 20 and Docket No. 33 respectively].   To the extent necessary to facilitate the relief requested herein, CFC will ask that the Court re-open the aforementioned cases.

3.      This Court has jurisdiction over the Bankruptcy Case and the subject matter of this Motion pursuant to 28 U.S.C. §§ 157 and 1334.   Consideration of this Motion is a core proceeding under 28 U.S.C. § 157(b)(2).   The statutory basis for the relief sought in this Motion is section 105(a) of the Bankruptcy Code.

## II.     FACTUAL BACKGROUND[1]

### A.     Ownership and Control of the Debtors

3.      According to the Schedules of Assets and Liabilities filed by T-F Holdings, the stock and/or membership interests of each of the other Debtors is owned by T-F Holdings.[2]

4.      From 2000 until January, 2016, Mike Potter was the Chief Executive Officer ("CEO") of T-F Holdings.[3]  During that time, Mr. Potter and his brother, Director Randy Potter (together, the "Potters"), were the largest shareholders of T-F Holdings.[4]  Mike and Randy Potter were respectively the CEO and a Director of each of the other Debtors from 2000 (or their respective dates of formation) until the end of 2015.[5]

5.      At the end of 2015, purported secured creditor of T-F Manufacturing and T-F Inc., XPV Water Fund (US) LP ("XPV") became the controlling shareholder of T-F Holdings and installed Joshua Scott as President and CEO, thereby replacing Mr. Potter (contemporaneous with Mr. Potter's resignation from the Board of Directors), all of which was approved by then Chairman of the Board of Directors and XPV Managing Director, John Coburn.[6]

---

[1] CFC's history and rights with respect to the Debtors and any property related to the Debtors' bankruptcy cases are detailed in *CFC, Inc.'s Amended Motion for Relief from Stay* [Case no. 16-33469, Docket No. 42; Case no. 16-33470, Docket No. 37] and its exhibits, all of which are hereby incorporated into this Motion by reference for all intents and purposes.

[2] T-F Holdings [Case No. 16-33474], Schedules of Assets and Liabilities and Statement of Financial Affairs [Dkt. No. 6], a true and correct copy of which is attached hereto as **Exhibit 1**, Schedule A, Question 15.

[3] Exhibit 1, Statement of Financial Affairs ("SOFA"), Question 29.

[4] *Id*.

[5] *See*, T-F Inc. [Case No. 16-33469], Amended Schedules of Assets and Liabilities and Statement of Financial Affairs [Dkt. No. 29], a true and correct copy of which is attached hereto as **Exhibit 2**, SOFA, Question 29; T-F Manufacturing [Case No. 16-33470], Schedules of Assets and Liabilities and Statement of Financial Affairs [Dkt. No. 16], a true and correct copy of which is attached hereto as **Exhibit 3**, SOFA, Question 29; T-F TX [Case No. 16-33471], Schedules of Assets and Liabilities and Statement of Financial Affairs [Dkt. No. 6], a true and correct copy of which is attached hereto as **Exhibit 4**, SOFA, Question 29; T-F Industrial [Case No. 16-33473], Schedules of Assets and Liabilities and Statement of Financial Affairs [Dkt. No. 10], a true and correct copy of which is attached hereto as **Exhibit 5**, SOFA, Question 29.

[6] Exhibit 1, SOFA, Questions 28-29; Exhibit 2, SOFA, Questions 28-29; Exhibit 3, SOFA, Questions 28-29; Exhibit 4, SOFA, Questions 28-29; Exhibit 5, SOFA, Questions 28-29.

B.     **Business of the Debtors**

6.     The Debtors manufactured screw based heat exchangers used in the water treatment, sewage, and chemical industries.[7]  Until April, 2016, the Debtors' corporate office was located in Benicia, California.[8]  In April, 2016, the Debtors moved their corporate office to Woodlands, Texas.[9]  The Debtors also had manufacturing facilities in Benicia, California and El Dorado, Arkansas.[10]

7.     T-F Inc. provided manufacturing, a fabrication facility, a machine shop, and a repair facility in Benicia, California,[11] and owned some of the equipment at the facility in El Dorado, Arkansas.  Also, as discussed in detail below, T-F Inc. provided the workforce and all administrative and financial functions for the other Debtors.

8.     T-F Manufacturing built equipment for customers at its manufacturing facility in El Dorado, Arkansas.

9.     T-F TX was created to establish a presence in Texas to facilitate sales in the oil and gas industry.  CFC is informed that no such sales were actually made through T-F TX.[12]

10.     T-F was created to establish a presence in California to facilitate sales.  CFC is informed that no such sales were actually made through T-F Industrial.[13]

11.     T-F Holdings owned the stock and/or membership interests in the other Debtors and had no other business or assets.

---

[7] **Exhibit 6**, *www.therma-flite.com/aboutus*.
[8] **Exhibit 7**, *www.therma-flite.com/news/news*.
[9] *Id.  See also*, Docket No. 1 for each of the Debtors (Petitions identifying 4200 Research Forrest Dr., Ste. 350, Woodlands, Texas as each Debtor's primary address).
[10] **Exhibit 8**, *www.therma-flite.com/buildit*.
[11] *Id.*
[12] Based upon statements of the Debtors' representatives made at the Section 341 meeting of creditors of T-F TX.
[13] Based upon statements of the Debtors' representatives made at the Section 341 meeting of creditors of T-F Industrial.

12.     Rather than identify or differentiate the different debtor entities, the Debtors held themselves out to the public as simply "Therma-Flite" or collectively as "Therma-Flite, Inc."[14]

## C.     The Debtors' Cash Management System

13.     T-F Inc. had two bank accounts: a checking account and a money market account at Bank of the West.[15]  None of the other Debtors scheduled any bank accounts whatsoever.[16]  It is CFC's understanding that all funds payable to T-F Manufacturing, T-F TX, T-F Industrial, or T-F Holdings were received and used by T-F Inc.  Similarly, all debts and expenses of T-F Manufacturing, T-F TX, T-F Industrial, or T-F Holding were paid by T-F Inc.[17]

## D.     Employees

14.     Although it was an operational entity that purportedly built equipment, T-F Manufacturing had no employees.  Nor did T-F TX, T-F Industrial, or T-F Holdings have employees.  Only T-F Inc. had employees.  Representatives of the Debtors stated at T-F Inc.'s Section 341 meeting of creditors that T-F Inc. employees worked at T-F Manufacturing's facility in El Dorado, Arkansas.

---

[14] Exhibit 6; Exhibit 7; Exhibit 8; **Exhibit 9**, Therma-Flite Brochure: *Bulk Transfer & Thermal Processing Technology*, **Exhibit 10**, Therma-Flite Brochure: *Indirect Thermal Desorption System*; **Exhibit 11**, Therma-Flite Brochure: *IC Series BIO-SCRU Dryer System*; **Exhibit 12**, Therma-Flite Brochure: *Holo-Scru Ash Coolers*.

[15] Exhibit 2, Schedule A, Question 3, SOFA, Question 10.

[16] Exhibit 1, Schedule A, Question 3, SOFA, Question 10; Exhibit 3, Schedule A, Question 3, SOFA, Question 10; Exhibit 4, Schedule A, Question 3, SOFA, Question 10; Exhibit 5, Schedule A, Question 3, SOFA, Question 10.

[17] In that regard, although T-F Manufacturing did not identify any bank accounts on its Schedules of Assets and Liabilities or Statement of Financial Affairs, CFC is informed that Manufacturing may have had one bank account at Southern Bancorp used for the limited purpose of making payments on the Southern Bancorp Promissory Note (discussed below).  It is CFC's understanding that each month T-F Inc. would deposit the amount due to Southern Bancorp into T-F Manufacturing's account, that Southern Bancorp would thereafter automatically withdraw its monthly payment from the account, and that the account was used for no other purposes.  T-F Manufacturing did not deposit any of its own revenues into the account or pay creditors other than Southern Bancorp from the account. One dedicated bank account in the name of T-F Manufacturing, funded by T-F Inc., and used for the sole purpose of paying the Southern Bancorp Promissory Note does not alter any of CFC's arguments made herein.  Rather, it supports CFC's contention that the other four Debtors were entirely financially dependent upon T-F Inc.

---

**E.     Revenues and Losses of the Debtors**

15.     Only T-F Inc. had revenues and losses.[18]  None of the other Debtors had revenues or losses.[19]

**F.     Tax Returns**

16.     The Debtors filed consolidated tax returns.[20]

**G.     Assets of the Debtors**

17.     T-F TX and T-F Industrial had no assets as of the Petition Date.[21]

18.     T-F Holdings' only assets were the stock and/or membership interests of the other Debtors.[22]

19.     T-F Manufacturing's only assets were office and manufacturing equipment and the real property located at 2524 Champagnolle Road, El Dorado, Arkansas (the "Real Property").[23]  T-F Manufacturing had no accounts receivable, no intellectual property, nor any other kind of assets.[24]

20.     T-F Inc. possessed office and manufacturing equipment, as well as all of the accounts receivable, all the patents, and all the trademarks.[25]  According to T-F, Inc.'s Schedules, on the Petition Date it had $208,659.49 in cash located in two accounts at Bank of the West.[26]  It is CFC's understanding that the T-F Inc. Trustee believes $73,094.59 of the funds to be

---

[18] Exhibit 2, Schedule A, Question 72 and SOFA, Question 1.
[19] Exhibit 1, Schedule A, Question 72 and SOFA, Question 1; Exhibit 3, Schedule A, Question 72 and SOFA, Question 1; Exhibit 4, Schedule A, Question 72 and SOFA, Question 1; Exhibit 5, Schedule A, Question 72 and SOFA, Question 1.
[20] Exhibit 1, SOFA, Question 31; Exhibit 2, SOFA, Question 31; Exhibit 3, SOFA, Question 31; Exhibit 4, SOFA, Question 31; Exhibit 5, SOFA, Question 31.
[21] Exhibit 4, Schedule A; Exhibit 5, Schedule A.
[22] Exhibit 1, Schedule A.
[23] Exhibit 3, Schedule A.
[24] *Id.*
[25] Exhibit 2, Schedule A.
[26] Exhibit 2, Schedule A.

unencumbered.  To the best of CFC's knowledge, the $73,094.59 represents the only assets or cash in any of the five bankruptcy estates thought to be currently unencumbered.[27]

## H. Creditors of the Debtors

### 1. Secured Debt

#### a. Co-Debt

21.     According to the Debtors' Schedules, all five of the Debtors are co-debtors on XPV's alleged $5,940,000.00 secured claim.[28]  XPV's alleged collateral includes, *inter alia*, equipment owned by T-F Inc. and T-F Manufacturing, a second priority lien on T-F Manufacturing's Real Property, and liens on T-F Inc.'s intellectual property.[29]

#### b. T-F TX, T-F Industrial and T-F Holdings' Secured Debt

22.     T-F TX, T-F Industrial and T-F Holdings have no scheduled secured creditors other than XPV.[30]

#### c. T-F Manufacturing's Secured Debt

23.     In addition to XPV, CFC, the Arkansas Economic Development Commission ("AEDC"), and Southern Bancorp allegedly hold secured claims against T-F Manufacturing.

24.     CFC holds the first priority lien on T-F Manufacturing's Real Property by virtue of a Mortgage recorded on April 30, 2015 in the records of Union County, Arkansas.[31]

25.     AEDC allegedly holds a lien on equipment owned by T-F Manufacturing by virtue of a Promissory Note and Security Agreement dated April 26, 2012 and a UCC-1

---

[27] Some liens on some assets may be avoidable, but no liens have yet been avoided on any assets.
[28] Exhibit 1, Schedules D and H; Exhibit 2, Schedules D and H; Exhibit 3, Schedules D and H; Exhibit 4, Schedules D and H; Exhibit 5, Schedules D and H.
[29] Exhibit 2, Schedule D; Exhibit 3, Schedule D; **Exhibit 13** (Mortgage recorded on June 27, 2016 as file number 2016R004701 in the records of Union County, Arkansas); **Exhibit 14** (Patent Security Agreement recorded on September 11, 2015  in the U.S. Patent and Trademark Office); **Exhibit 15** (Trademark Security Agreement recorded on September 11, 2015 in the U.S. Patent and Trademark Office).
[30] Exhibit 1, Schedule D; Exhibit 4, Schedule D; Exhibit 5, Schedule D.
[31] A true and correct copy of the Mortgage recorded April 30, 2015, as instrument no. 2015R003300 in the records of Union County, Arkansas is attached hereto as **Exhibit 16**.

Financing Statement filed April 27, 2012.[32]  Although AEDC's Promissory Note and Security Agreement were by and between AEDC and T-F Manufacturing, AEDC filed proof of claim no. 5 in the T-F Inc. case.[33]

26.    Southern Bancorp allegedly holds a lien on equipment owned by T-F Manufacturing by virtue of a Promissory Note and Commercial Security Agreement dated June 6, 2013 and a UCC-1 Financing Statement filed June 19, 2013.[34]

27.    CFC is presently unaware of any creditors alleging to hold security interests in property owned by T-F Manufacturing other than XPV, CFC, AEDC, and Southern Bancorp.[35]

#### d.    **T-F Inc.'s Secured Debt**

28.    In addition to XPV, CFC is scheduled as holding a claim against T-F Inc. secured by, *inter alia*, certain of T-F Inc.'s accounts receivable and certain equipment.[36]

29.    Although Bank of the West was not scheduled as a secured creditor, CFC is informed that the bank asserts a security interest in the majority of T-F Inc.'s money market account held at the bank.

30.    CFC is not presently aware of any other creditors alleging to hold security interests in property owned by T-F Inc. other than itself, Bank of the West, and XPV.[37]

### 2.    **Priority Debt**

31.    None of the Debtors other than T-F Inc. have any scheduled priority creditors.[38]

---

[32] A true and correct copy of AEDC's Proof of Claim, filed in case no. 16-33469 (T-F Inc.) attaching AEDC's Promissory Note and Security Agreement dated April 26, 2012 and UCC-1 Financing Statement filed April 27, 2012 is attached hereto as **Exhibit 17**.

[33] Exhibit 17.

[34] True and correct copies of Southern Bancorp's Promissory Note and Commercial Security Agreement dated June 6, 2013 and UCC-1 Financing Statement filed June 19, 2013 are attached hereto as **Exhibit 18**.

[35] CFC has been informed that certain customers, including Nuverra Environmental Solutions, Inc., claim to own equipment being built for them by one or more of the Debtors which was in the Debtors' possession on the Petition Date.

[36] Exhibit 2, Schedule D.  *See also, CFC, Inc.'s Amended Motion for Relief from Stay* [Case no. 16-33469, Docket No. 37] which details CFC's collateral.

[37] *See* Footnote 34.

32.     T-F, Inc.'s scheduled priority creditors include the Arkansas employees and the Arkansas Department of Finance and Administration (*i.e.*, the Arkansas authority responsible for income and withholding taxes), as well as other Texas, California, and Federal taxing authorities.[39]

### 3.     Unsecured Debt

#### a.     Co-Debt

33.     All five of the Debtors are scheduled as owing BDO USA LLP ("BDO") $34,930.00 as a general unsecured debt.[40]  It is unclear from the Debtors' Schedules whether BDO is owed a total of $34,930.00 by all five of the Debtors combined, or whether each individual Debtor owes BDO $34,930.00 (for a total of $174,650.00).

#### b.     T-F TX Debt

34.     Other than BDO, T-F TX only scheduled two other general unsecured creditors (Aventine Hill Partners, Inc. and Vortex Corporation), both of which are scheduled as holding claim amounts of $0.00.[41]

#### c.     T-F Industrial Debt

35.     Other than BDO, T-F Industrial only scheduled one other general unsecured creditor (Vortex Corporation), which is scheduled as holding a claim of $0.00.[42]

#### d.     T-F Holdings Debt

36.     Other than BDO, T-F Holdings only scheduled two other general unsecured creditors (Vortex Corporation and Gordon & Rees).[43]  Gordon & Rees' claim is scheduled as

---

[38] Exhibit 1, Schedule E; Exhibit 2, Schedule E; Exhibit 3, Schedule E; Exhibit 4, Schedule E. Exhibit 5, Schedule E.
[39] Exhibit 2, Schedule E.
[40] Exhibit 1, Schedule F; Exhibit 2 Schedule F; Exhibit 3, Schedule F; Exhibit 4, Schedule F; Exhibit 5, Schedule F.
[41] Exhibit 4, Schedule F.
[42] Exhibit 5, Schedule F.
[43] Exhibit 1, Schedule F.

$0.00., while Vortex Corporation's claim is scheduled as $13,411.00.[44]

### e.    T-F Manufacturing Debt

37.    Including BDO, T-F Manufacturing scheduled sixteen (16) creditors holding a total of $65,246.15 in general unsecured claims.[45]   BDO's $34,930.00 claim is the largest scheduled unsecured claim against T-F Manufacturing.  The other fifteen (15) scheduled debts total $30,316.15 combined.   Of T-F Manufacturing's sixteen scheduled general unsecured creditors, seven (7) are also scheduled as general unsecured creditors of T-F Inc.[46]

### f.    T-F Inc. Debt

38.    The overwhelming majority of the Debtors' general unsecured debt was scheduled in the T-F Inc. case.  T-F Inc. scheduled one hundred fifty-seven (157) general unsecured creditors holding a combined total of $1,918,107.52 in claims.[47]

39.    There is significant overlap among the scheduled general unsecured creditors of T-F Inc. and the other Debtors.  Each of the scheduled general unsecured creditors of T-F TX, T-F Industrial and T-F Holdings (*i.e.* BDO, Vortex Corporation, Gordon& Rees, and Aventine Hill Partners, Inc.) are also scheduled as general unsecured creditors of T-F, Inc.[48]  As stated above, seven (7) of T-F Manufacturing's sixteen (16) scheduled general unsecured creditors are also scheduled as general unsecured creditors of T-F Inc.[49] Of the nine (9) scheduled general unsecured creditors of T-F Manufacturing ostensibly not scheduled in the T-F Inc. case, one, AEDC, has already filed a proof of claim in the T-F Inc. case.[50]

---

[44] Exhibit 1, Schedule F.
[45] Exhibit 3, Schedule F.
[46] Attached hereto as **Exhibit 19** is a spreadsheet identifying the overlap between T-F Manufacturing's scheduled general unsecured creditors and T-F Inc.'s scheduled general unsecured creditors.  Exhibit 19 is intended for demonstrative purposes.
[47] Exhibit 2, Schedule F.
[48] Exhibit 2, Schedule F.
[49] Vortex Corporation is not scheduled as a general unsecured creditor of T-F Manufacturing. Exhibit 3, Schedule F.
[50] Exhibit 17.

40.     Several of the scheduled general unsecured creditors of T-F Inc. are located in or around El Dorado, Arkansas, and likely provided goods or services to T-F Manufacturing or hold claims because of T-F Manufacturing.[51]   The T-F Inc. scheduled general unsecured creditors from Arkansas include Dorothy Raley, the Tax Collector for Union County Arkansas (where the town of El Dorado is located), Hepco (located in El Dorado, Arkansas), Office Equipment of Southern Arkansas (located in El Dorado, Arkansas), TJC Inc. Crane Services (located in Camden, Arkansas, 31 miles from El Dorado, Arkansas), and United Industrial Supply, Inc. (located in El Dorado, Arkansas).[52]   As of the date of filing this Motion, at least three entities scheduled as holding general unsecured claims against T-F Inc. have filed proofs of claim in the T-F Inc. case attaching documents indicating that they provided goods or services to T-F Manufacturing.[53]

I.     **Executory contracts**

41.     According to the Debtors' schedules, none of the Debtors other than T-F Inc. had any executory contracts.[54]

### III.     RELIEF REQUESTED

42.     CFC respectfully requests that the Court enter an order substantively consolidating the bankruptcy estates of each of the Debtors into the estate of Therma-Flite, Inc., Case No. 16-33469, and granting such other relief as may be necessary or appropriate.

---

[51] Exhibit 2, Schedule F.
[52] Exhibit 2, Schedule F, nos. 3.37, 3.60, 3.98, 3.135, 3.144.
[53] *See*, Proof of Claim no. 1, filed by Airgas USA, LLC, , a true and correct copy of which is attached hereto as **Exhibit 20**, Proof of Claim no. 9, filed by Salina Vortex Corporation, a true and correct copy of which is attached hereto as **Exhibit 21**, and Proof of Claim no. 11, filed by Uline Shipping Supplies, a true and correct copy of which is attached hereto as **Exhibit 22**, which attach invoices and delivery orders addressed to Therma-Flite Manufacturing Inc. at 2524 Champagnolle Rd., El Dorado Arkansas.
[54] Exhibit 1, Schedule G; Exhibit 2, Schedule G; Exhibit 3, Schedule G; Exhibit 4, Schedule G; Exhibit 5, Schedule G.

## IV.   <u>LEGAL AUTHORITY</u>

43.     "Substantive consolidation is a mechanism for administering the bankruptcy estates of multiple related entities." *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 692 (Bankr. S. D. Tex. 2009).   "Although the authority of a bankruptcy court to order a 'substantive' consolidation is not expressly provided by the Bankruptcy Code or Bankruptcy Rules, many courts have held that bankruptcy courts possess such authority pursuant to their general equity powers as contained in Section 105(a) of the Bankruptcy Code, 11 U.S.C. § 105(a), which authorizes the bankruptcy courts to issue 'orders' necessary to carry out the provisions of the Code." *In re DRW Property Co.*, 54 B.R. 489, 494 (Bankr. N.D. Tex. 1985) (McConnell, J.) *but see also Grupo Mexicano de Desarrollo SA v. Alliance Bond Fund Inc.*, 527 U.S. 308 (1999). [Limiting a Bankruptcy Court's equitable discretion, in deciding on the issuance of a preliminary injunction, but not discussing or confronting the issue of substantive consolidation.]   "No Code provision provides for substantive consolidation; the authority of the court to order substantive consolidation is derived from the equitable powers of the bankruptcy court." *In re AHF Development Ltd.*, 462 B.R. 186, 195 (Bankr. N.D. Tex. 2011) (Jones, J.).

44.     Substantive consolidation "usually results in, *inter alia*, pooling the assets of, and claims against, the two entities; satisfying liabilities from the resultant common fund; eliminating inter-company claims; and combining the creditors of the two companies for purposes of voting on reorganization plans." *Clyde Bergemann, Inc. v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.)*, 250 F.3d 955, 958, fn. 5 (5th Cir. 2001).   *See also, DRW Property*, 54 B.R. at 494 ("Substantive consolidation not only eliminates intercompany claims of debtor entities but also pools their assets into a common fund against which the creditors of all of the Debtors can assert their claims").   "Fundamentally, 'substantive consolidation occurs when the assets and liabilities

of separate and distinct legal entities are combined in a single pool and treated as if they belong to one entity.'" *Babcock & Wilcox*, 250 F.3d at 958, fn. 5; *In re Introgen Therapeutics*, 429 B.R. 570, 581 (Bankr. W.D. Tex. 2010) (Gargotta, J.).

45.    "Substantive consolidation results in the combination of two or more debtors into a single pool from which the claims of creditors are paid ratably." *AHF Development*, 462 B.R. at 195.  "Substantive consolidation also has the further effect of eliminating duplicative claims filed against related debtors by creditors uncertain as to where the liability should be allocated." *DRW Property*, 54 B.R. at 494; *AHF Development*, 462 B.R. at 197.

46.    "Substantive consolidation facilitates the underlying purpose of bankruptcy proceedings by allowing the court to attach a pool of assets that should have been included since the commencement of the bankruptcy case . . . . 'If the separate existence of the two companies was a mere fiction, then consolidation simply recognizes the existing reality that . . . all property was held in a single entity.'"  *In re Permian Producers Drilling, Inc.*, 263 B.R. 510, 516 (W.D. Tex. 2000) (citation omitted; alteration in original).  "The Supreme Court has even recognized that consolidation of different but related estates is a vital tool in fulfilling a fundamental purpose of bankruptcy." *Introgen Therapeutics*, 429 B.R. at 582. *See, Permian Producers Drilling*, 263 B.R. at 516 (same).

47.    "There is no universally accepted standard for substantive consolidation and it has been said to be a highly fact-specific analysis made on a case-by-case basis." *Introgen Therapeutics*, 429 B.R. at 582;  *AHF Development*, 462 B.R. at 195.  "[I]n order to convince a court of the propriety of ordering substantive consolidation, the party proposing consolidation must first show identity between the entities to be consolidated, and then show that consolidation is necessary in order to prevent harm or prejudice, or to effect a benefit generally." *Introgen*

*Therapeutics*, 429 B.R. at 584; *Permian Producers Drilling*, 263 B.R. at 518 ("the party proposing consolidation must show identity between the entities to be consolidated"). "[S]ome courts have ordered consolidation when the record shows the entities are so hopelessly intertwined that sorting them out would cause prejudice to all." *AHF Development*, 462 B.R. at 197.

## A.    The Traditional Substantive Consolidation Factors

48.    Two categories of tests for considering substantive consolidation have developed: traditional factor-based tests and balancing tests. *Introgen Therapeutics*, 429 B.R. at 582; *AHF Development*, 462 B.R. at 195-96.  Bankruptcy Courts in Texas have employed a combination of the two types of tests. *Introgen Therapeutics*, 429 B.R. at 582-83; *Permian Producers Drilling*, 263 B.R. at 518; *AHF Development*, 462 B.R. at 195-97; *DRW Property*, 54 B.R. at 495.

49.    With traditional tests, Courts consider multiple factors bearing on the unity of the entities, most commonly:

> (1) the degree of difficulty in segregating and ascertaining individual assets and liability;
> (2) the presence or absence of consolidated financial statements;
> (3) the profitability of consolidation at a single physical location;
> (4) the commingling of assets and business functions;
> (5) the unity of interests and ownership between the various corporate entities;
> (6) the existence of parent and inter-corporate guarantees on loans; and
> (7) the transfer of assets without formal observance of corporate formalities.

*Introgen Therapeutics*, 429 B.R. at 582; *AHF Development*, 462 B.R. at 195-96; *Permian Producers Drilling*, 263 B.R. at 518; *DRW Property*, 54 B.R. at 495.  Other factors considered by courts have included:

> parent corporation owns all or a majority of the capital stock of the subsidiary; parent and subsidiary have common officers and directors; parent finances subsidiary; parent is responsible for incorporation of subsidiary; subsidiary has grossly inadequate capital; parent pays salaries, expenses, or losses of subsidiary; subsidiary has substantially no business except with parent; subsidiary has

> essentially no assets except for those conveyed by parent; parent refers to subsidiary as department or division of parent; directors or officers of subsidiary do not act in interests of subsidiary, but take directions from parent; formal legal requirements of the subsidiary as a separate and independent corporation are not observed . . . .

*AHF Development*, 462 B.R. at 195-96.

50.     "[T]hese factors, considered alone, should not be dispositive of the issue of substantive consolidation. Rather, they should be evaluated within the larger context of balancing the prejudice resulting from the proposed order of consolidation with the prejudice movant alleges it suffers from debtor's separateness." *DRW Property*, 54 B.R. at 495. *Accord, AHF Development*, 462 B.R. at 196 ("No single element or group of elements is determinative to the outcome.  At a minimum, however, there must be a close relationship between the two entities for consolidation to occur").

**B.     Balancing Tests**

51.     There are a variety of "balancing tests" to choose from. *AHF Development*, 462 B.R. at 196-97.  The balancing tests basically distill the specific factors from the traditional tests into overarching themes for the Court to weigh.

52.     For example, "[t]he Second Circuit distilled the many factors courts have considered into two critical factors: '(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit…; or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.' *Introgen Therapeutics*, 429 B.R. at 582-83 (*citing, In re Augie/Restivo Baking Co.,* 860 F.2d 515, 519 (2d Cir. 1988)). As the Court in *Introgen Therapeutics* noted, "[t]he presence of either factor is sufficient to order substantive consolidation. . . ." *Introgen Therapeutics*, 429 B.R. at 582-83.

---

53.     Other Courts have boiled the elements of the traditional test down to "weighing the economic prejudice of separateness versus economic prejudice of consolidation" or "whether consolidation is necessary to avoid some harm or realize some benefit." *AHF Development*, 462 B.R. at 196-97 (*citing In re Snider Bros., Inc.,* 18 B.R. 230 (Bankr. D.Mass. 1982), and *Eastgroup Properties v. Southern Motel Ass'n, Ltd.,* 935 F.2d 245 (11th Cir. 1991), respectively). The Court in *Permian Producers Drilling* considered both the *Snider Bros.* and the 11th Circuit balancing tests. *Permian Producers Drilling*, 263 B.R. at 518 (*citing Snider Bros.* and *Reider v. FDIC (In re Reider)*, 31 F.3d 1102 (11th Cir. 1994)).

54.     Ultimately, "the court will order substantive consolidation only if the benefits counterbalance or outweigh the harms" *Permian Producers Drilling*, 263 B.R. at 518. "Almost all substantive consolidations will cause prejudice to some creditors of at least one of the entities." *AHF Development*, 462 B.R. at 197. *See also, DRW Property*, 54 B.R. at 494 ("It must be recognized and affirmatively stated that substantive consolidation, in almost all instances, threatens to prejudice the rights of creditors"). "The parties seeking consolidation bear the burden of proving that any prejudice resulting from consolidation is outweighed by the greater prejudice posed by the continued separation of the estates . . . . A necessary corollary of this proposition is that it is incumbent upon the party seeking consolidation to demonstrate that it would be prejudiced if the estates were to remain as separate." *DRW Property*, 54 B.R. at 495; *AHF Development*, 462 B.R. at 198.

55.     The party seeking consolidation must carry its burden by a preponderance of the evidence. *AHF Development*, 462 B.R. at 198; *Introgen Therapeutics*, 429 B.R. at 582.

## V.     ARGUMENT

56.     Under both the traditional and balancing tests, the overwhelming weight of evidence supports substantive consolidation of the Debtors' estates.   Among other things, substantive consolidation will prevent undue harm and prejudice to CFC and the vast majority of other creditors of the Debtors.

A.     **The Traditional Factors Support Substantive Consolidation**

    1.     **There is a High Degree of Difficulty in Segregating and Ascertaining Individual Assets and Liabilities**

57.     As discussed above, T-F Manufacturing and T-F Inc. were the primary operational entities for the Debtors.   Both T-F Manufacturing and T-F Inc. had manufacturing facilities and owned equipment, and there is a high degree of difficulty in segregating what equipment belongs to which Debtor and what equipment is collateral for which creditor.

58.     T-F Inc. purchased all of the equipment the Debtors allege belongs to T-F Manufacturing.   Further, much of the equipment owned by T-F Inc. is of the same kind as the equipment owned by T-F Manufacturing and at least some of T-F Inc.'s equipment was kept at T-F Manufacturing's Real Property.[55]   Since most of the equipment is untitled, it is impossible to determine which assets are those purported to belong to T-F Inc. and which are those purported to belong to T-F Manufacturing.   Additionally, to the extent records exist at all, the Debtors' records regarding what assets are where and which assets are collateral for which debts are vague and ambiguous.   Therefore, creditors such as CFC have had difficulty determining where their assets are located and which pieces of equipment constitute their collateral.[56]

---

[55] *See* Exhibit 2, Schedule A, Question 47.1 and Exhibit 3 attached thereto (list of T-F Inc. equipment); Exhibit 3, Schedule A, Question 50 and Exhibit 2 attached thereto (list of T-F Manufacturing equipment).

[56] To further complicate matters, much of the equipment of both Debtors has disappeared.   As reported by the Manufacturing Trustee in her Motion to Abandon Personal Property [Dkt. 48], a true and correct copy of which is attached hereto as **Exhibit 23**, the Real Property has been burglarized since the Petition Date.   It is unclear what may have been stolen.

59.     There is also a high degree of difficulty distinguishing the liabilities of the Debtors.  As discussed above, pre-petition, T-F Inc. paid all the debts and expenses of the other Debtors.   It comes as no surprise, therefore, that T-F Inc.'s Schedules include liabilities attributable to the businesses of the other Debtors, and that entities scheduled as T-F Manufacturing creditors have filed proofs of claim in the T-F Inc. case.  T-F Inc.'s Schedules include Arkansas taxes, the workers assigned to the Arkansas Real Property, and vendors who supplied goods and services at the Arkansas Real Property.[57]  As evidence of this point, Airgas USA, LLC ("Airgas"), a scheduled creditor of T-F Inc. filed Proof of Claim no. 1 in the T-F Inc. case attaching invoices and delivery orders addressed to Therma-Flite Manufacturing Inc. at the Real Property address.[58] Similarly, Salina Vortex Corporation, a/k/a Vortex Corporation ("Vortex"), and Uline Shipping Supplies, both scheduled creditors of T-F Inc., filed proofs of claim (no. 9 and no. 11, respectively) in the T-F Inc. case attaching invoices specifying delivery to T-F Manufacturing at the Arkansas Real Property.[59] Meanwhile, AEDC, which made a loan purportedly to T-F Manufacturing and was scheduled as a creditor of T-F Manufacturing but was paid by T-F Inc., has filed a proof of claim in T-F Inc.'s case.[60]

60.     It is impossible to determine from the Schedules alone which of T-F Inc.'s scheduled creditors supplied goods and services to T-F Inc., T-F Manufacturing, T-F TX or T-F Industrial.  Further, since T-F Inc. paid the debts and expenses of all the other Debtors, it may not even be possible to accurately determine from the Debtors' records which debts belong to which Debtor.  Certainly, it would not be unreasonable for all of the creditors to believe themselves to be creditors of T-F Inc. and it would be fundamentally unfair to isolate some of the

---

[57] Exhibit 2, Schedules E and F.
[58] Exhibit 20.
[59] Exhibits 21 and 22.
[60] *See* Exhibit 17 (Proof of Claim No. 5).

creditors in the T-F Manufacturing case based upon some arbitrary determination that they provided services to T-F Manufacturing while similarly situated creditors who provided services to T-F Manufacturing are included among the T-F Inc. creditors.

### 2.   One Debtor Managed the Finances of All

61.     T-F Inc. supported the other Debtors. T-F Manufacturing, T-F TX and T-F Industrial could not have operated without T-F Inc.'s provision of money and financial structure. As detailed above, none of the Debtors other than T-F Inc. had any independently funded and used bank accounts. All of the expenses of T-F Manufacturing, T-F TX and T-F Industrial were paid by T-F, Inc., including taxes, rent payments,[61] insurance, and supplies, and T-F Inc. received all funds payable to the other Debtors (such as customer payments and loan proceeds). Only T-F Inc. had profits or losses, because it was the only Debtor with money coming in and going out.[62]  Further, all of the personnel who worked at T-F Manufacturing, T-F TX and T-F Industrial were employed and paid by T-F Inc.  The other Debtors were essentially dependent departments of T-F Inc.  Since the Debtors operated as one pre-petition, it makes little sense to separate them in bankruptcy.

### 3.   Consolidation Will Benefit All Creditors, Make Administration More Efficient, and Will Reduce the Burden on Creditors

62.     Here, where the equipment assets of both T-F Inc. and T-F Manufacturing have already been abandoned by their respective Trustees, the element of profitability of consolidation at one physical location is moot.  Nevertheless, consolidation will benefit the estates and the creditors, make administration more efficient, and will reduce the burden on creditors.

---

[61] Representatives of T-F Inc. stated at its Section 341 meeting of creditors that T-F Inc. paid the rent for the locations used by T-F TX.

[62] Exhibit 1, Schedule A, Part 3 and Question 72; Exhibit 2, Schedule A, Part 3 and Question 72; Exhibit 3, Schedule A, Part 3 and Question 72; Exhibit 4, Schedule A, Part 3 and Question 72; Exhibit 5, Schedule A, Part 3 and Question 72.

63.     The only Debtor with significant physical assets remaining in the estate is T-F Manufacturing, which holds the Real Property. T-F Inc.'s remaining assets include patents, trademarks and the $73,094.59 in cash believed to be unencumbered.

64.     Uniting the assets and liabilities of the estates will also make administration of the cases more efficient and will simplify the burden on creditors.  As discussed above, entities which provided goods and services to T-F Manufacturing and the other Debtors have been scheduled as creditors in the T-F Inc. case, and creditors scheduled in the T-F Manufacturing case have filed claims in the T-F Inc. case.  Consolidation will make administration of the cases more efficient by eliminating the need to determine which entities provided goods and services to which Debtor or to distinguish which entities are creditors of which Debtor.  A claim allowable against any of the Debtors will be allowable against the consolidated estate.  Further, consolidation will ease the burden on creditors by eliminating the need to file proofs of claim in multiple cases where they might be creditors.[63]  To the extent any non-cash tangible personal property assets remain in the estates, consolidation will also make administration more efficient by eliminating any possible need for the Trustees to determine which entity owned which assets. Thus, while the profitability of consolidating assets at one single physical location might be a moot question at this time, consolidating the remaining assets and liabilities into one estate will be profitable for the estates and the creditors.

### 4.     The Assets and Business Functions Were Hopelessly Commingled

65.     It is clear that the Debtors' assets and business functions were hopelessly commingled.  As explained above, the Debtors acted as one economic unit, and one Debtor paid the expenses of all and received revenues for all.  The Debtors' assets were mixed at least two,

---

[63] Additionally, if the creditors do not have to file duplicative proofs of claim, the Trustees will not need to object to the duplicates, making administration more efficient.

and probably three or more locations, and creditors providing services to one Debtor have been included on the Schedules of another Debtor.[64] It is impossible to determine from the Schedules alone which assets were at whose location, or which creditors provided services to which Debtor. Under these circumstances, substantive consolidation is the best, most fair and most equitable way to cut through the confusion.

**5.      The Debtors Shared Ownership and Control**

66.      As discussed above, T-F Holdings owned the stock/membership interests of the four other Debtors, while at any given time all five of the Debtors shared the same management. Prior to the end of 2015, all of the Debtors were controlled by the Potters.  From the end of 2015, all of the Debtors were controlled by the management personnel approved and/or appointed by XPV.  In addition, T-F Holdings board of directors consisted of a four person board, of that board, former CEO, Joshua Scott, was a member on all of the other Debtor's board of directors.[65] The Debtors were jointly managed by first one group of people, and then by a second group of people, all of whom consistently treated the Debtors as one enterprise, rendering substantive consolidation appropriate.

**6.      The Debtors Acted as Guarantors, Sureties and Co-Debtors for Each Other**

67.      The Debtors also acted as guarantors, sureties, and co-debtors for each other.  As explained in *CFC, Inc.'s Amended Motion for Relief from Stay* [Case no. 16-33469, Docket No. 37] and its exhibits, CFC made a loan to T-F Inc., for which T-F Manufacturing acted as a surety and provided collateral.[66] All five of the Debtors were also co-debtors on XPV's loans, the

---

[64] *See*, Exhibits 20 and 21 and Exhibit 2, Schedule F.
[65] Based on statements made at T-F Holdings section 341 meeting of creditors.
[66] *See* Exhibit 16, p. 1.

practical effect of which was to make each Debtor a guarantor of the XPV loans.[67]  In return for T-F Manufacturing acting as a surety and providing collateral for an XPV loan provided to T-F Inc., T-F Manufacturing obtained the ability to continue operations.[68] Additionally, as discussed above, T-F Inc. made payments on behalf of T-F Manufacturing for the loans of AEDC and Southern Bancorp.  Thus, the Debtors not only acted as co-debtors, sureties, and guarantors for each other, but they also paid each other's debts.   Under such circumstances, substantive consolidation is appropriate.

### 7.    The Debtors Operated as One Entity Without Observance of Formalities Between Them

68.    It is clear from the above that the Debtors operated as one entity.[69]  Indeed, since four of the Debtors had no operating accounts or employees, they had no option but to operate as one entity, with T-F Inc. providing administration, employees, and all other necessities.  Since the Debtors' daily operations required T-F Inc. to pay expenses and engage employees on behalf of the other Debtors, upon information and belief the Debtors did not observe formalities such as written loan agreements between the Debtors, credit-memos, etc., to keep track of the monies being paid and services being provided to the other Debtors.[70]  Rather, T-F Inc. simply made payments as necessary for the other Debtors without any loan or services agreements with the other Debtors.[71] T-F Inc. and the other Debtors did not participate in intercompany transactions

---

[67] *See* Exhibit 1, Schedules D and H; Exhibit 2, Schedules D and H; Exhibit 3, Schedules D and H; Exhibit 4, Schedules D and H; Exhibit 5, Schedules D and H.  Note that since none of the Debtors other than T-F Inc. had independent bank accounts, they could not have received any of the XPV loan proceeds.  Thus, the "loan" to all five of the Debtors was for all practical effects a loan to T-F Inc. guaranteed by the other Debtors.

[68] Based on statements made at Therma-Flite Manufacturing section 341 hearing.

[69] Based upon his statements made during the T-F Holdings Section 341 meeting of creditors, former CEO, Joshua Scott, believed the entities under T-F Holdings were created for the purpose of developing the manufacturing location in Arkansas. Furthermore, Mr. Scott could not distinguish between the separate entities, continuously stating that the company was run as a single entity, Therma-Flite "period" not five separate entities and that when he refers to the company, he is referring to all five of the Debtors.

[70] *See,* Exhibits 1 – 5,  Schedules F, reflecting no scheduled inter-company loan agreements between the Debtors.

[71] *See*, Exhibits 1 – 5, Schedules G, reflecting no executory contracts between the Debtors.

---

among each other.  T-F Manufacturing did not sell its manufactured goods to customers or to T-F Inc., and the proceeds from the goods manufactured by T-F Manufacturing went directly to T-F Inc.[72]

69.     Additionally, the Debtors held themselves out to the public as one entity, known simply as "Therma-Flite."[73]   In their published promotional materials, the Debtors did not distinguish between T-F Inc., T-F Manufacturing, T-F TX or T-F Industrial.[74]  Rather, they were all referred to as "Therma-Flite," and the Arkansas location was merely another operational location for "Therma-Flite."[75]  Thus, the Debtors not only presented themselves to the public as one entity, management considered "Therma-Flite" as one entity, and they actively encouraged people to treat them as one entity.[76]   Under these circumstances maintaining the bankruptcy estates as separate estates is fundamentally unfair and inequitable.  In the interests of fairness and equity, the cases should be substantively consolidated.

### 8.     Other Factors Weighing In Favor of Consolidation

70.     In addition to the standard seven traditional substantive consolidation elements discussed above, the majority of the less-common factors cited in *AHF Development* also demonstrate unity among the Debtors and support substantive consolidation.  Specifically,

- T-F Holdings owns all of the stock or membership interests of the other Debtors;

- The Debtors have common officers and directors;

- T-F Inc. financed all the other Debtors;

---

[72] Based upon statements made during the T-F Manufacturing Section 341 meeting of creditors.

[73] *See*, Exhibits 6, 7, 8 and **Exhibit 24**, a true and correct copy of the Therma-Flite press release, dated April 2, 2014, entitled "Therma-Flite Expansion in El Dorado, Arkansas Changes Economic Climate" found at www.prnewswire.com/news-releases/therma-flite-expansion-in-el-dorado-arkansas-changes-economic-climate-253541401.

[74] Exhibits 6, 7, 8 and 23.

[75] Exhibit 8.

[76] Based on statements made during the T-F Manufacturing section 341 meeting of creditors.

- T-F Manufacturing, T-F TX, T-F Industrial and T-F Holdings all had grossly inadequate capital;

- T-F Inc. paid for employees, expenses and losses for the other Debtors;

- T-F Manufacturing and the other Debtors had no assets except those purchased for them by T-F Inc.;

- The Debtors held themselves out to the public as simply "Therma-Flite" without distinguishing the various entities.

71.     Pre-petition, the Debtors functioned as one economic unit.  It is hardly surprising, therefore, that the overwhelming majority of the traditional substantive consolidation factors weigh in favor of consolidation.  Customers and creditors may have dealt with the Debtors at T-F Manufacturing's Real Property, but they exchanged money with T-F Inc. Under these circumstances, it is inequitable to keep the bankruptcy estates of these entities separate.

**B.     <u>The Balancing Tests Also Weigh in Favor of Substantive Consolidation</u>**

72.     In addition to the traditional substantive consolidation factors, the balancing tests also weigh in favor of substantive consolidation.  For example, both Second Circuit factors are met in this case.  Based upon the Proofs of Claim filed thus far and upon information and belief, multiple creditors dealt with the Debtors as a single economic unit and did not rely on their separate identify in extending credit.  Further, as discussed above, the affairs of the Debtors are so entangled that consolidation will benefit all creditors.

73.     Substantive consolidation will join the assets and the liabilities of the other Debtors with those of T-F Inc. As noted in *Permian Producers Drilling*, substantive consolidation almost always prejudices some creditors to some extent. *Permian Producers Drilling*, 263 B.R. at 518. Here, that prejudice is fairly minimal.  Most of the debt is either secured or the creditors have already been scheduled (or have filed proofs of claim) as creditors of T-F Inc.

74.     All of the priority debt is already scheduled in the case of T-F Inc.  None of the other Debtors scheduled any priority debt.

75.     All of the scheduled general unsecured creditors of T-F TX, T-F Industrial, and T-F Holdings are also already scheduled as general unsecured creditors of T-F Inc. Of those creditors, Gordon & Rees and Aventine Hill Partners, Inc. were scheduled as holding claims of $0.00.  BDO's claim for $34,930 appears to be jointly owed by all the Debtors, and would therefore already be part of T-F Inc.'s unsecured debt.  Meanwhile, although Vortex is scheduled as holding a claim of $13,411 in the T-F Holdings case, it is unclear whether that claim has already been included by Vortex in the proof of claim it filed in the T-F Inc. case.[77]

76.     Other than T-F Inc., only T-F Manufacturing appears to have any meaningful scheduled general unsecured debt. More than half of T-F Manufacturing's $65,246.15 in unsecured debt, however, is the apparently joint claim of BDO for $34,930, which is already scheduled in the T-F Inc. case. Of the $30,316.15 balance, $734.41 is scheduled as held by entities already scheduled as creditors of T-F Inc.[78] Thus, it appears that substantive consolidation would result in adding only $29,581.74 in general unsecured claims held by creditors not already scheduled in the T-F Inc. case.  The addition of this scheduled unsecured debt would not meaningfully dilute T-F Inc.'s pool of general unsecured debt. Therefore, the prejudice the creditors of T-F Inc. will suffer upon substantive consolidation appears to be minimal.[79]

77.     On the other hand, the prejudice the creditors of T-F Manufacturing will suffer if the cases are not substantively consolidated is substantial.  As discussed above, the only Debtor

---

[77] *See* Exhibit 21.
[78] *See* Exhibit 19.
[79] Since it is unclear whether secured creditors AEDC or Southern Bancorp hold unsecured deficiency claims or how much such claims would be if they exist, it is impossible to include such claims in this analysis.

entity with any presently unencumbered assets or funds is T-F Inc., which is holding $73,094.59 in apparently unencumbered funds. The creditors of T-F Manufacturing were all paid by T-F Inc. and they are justified in expecting payment from T-F Inc.'s estate. Since T-F Manufacturing did not have its own operating accounts, it and its creditors relied upon T-F Inc. to pay T-F Manufacturing's expenses.

78.    Excluding T-F Manufacturing's creditors from the T-F Inc. case excludes them from any right to participate in the only apparently unencumbered funds among the estates. And such exclusion appears to be arbitrary. As discussed above, T-F Inc.'s schedules include several persons and entities that provided goods and services to T-F Manufacturing, including the employees who worked at the Arkansas Real Property, the Tax Collector for Union County, Hepco, Office Equipment of Southern Arkansas, TJC Inc. Crane Services, and United Industrial Supply, Inc., all of which were located in or around El Dorado, Arkansas. Meanwhile, other scheduled T-F Inc. creditors, such as Airgas, Vortex, and Uline, attached invoices to their filed proofs of claim which demonstrated that they provided goods and services to T-F Manufacturing. If T-F Inc.'s scheduled creditors include some entities that provided goods and services to T-F Manufacturing, why were other entities that similarly provided goods and services to T-F Manufacturing scheduled as creditors of T-F Manufacturing? The decision to schedule some of the entities that provided goods and services to T-F Manufacturing as creditors of T-F Inc. and others as creditors of T-F Manufacturing appears to have been arbitrary. It is fundamentally unfair for similarly situated creditors to be segregated, with some creditors scheduled in the case with unencumbered funds while others are isolated in a case with no currently unencumbered funds.

79.     More than just the creditors of T-F Manufacturing will suffer prejudice if the cases are not consolidated, however.  The creditors of T-F Inc. will also suffer prejudice if the cases are not consolidated.  Many creditors appear to have supplied goods and services to both T-F Inc. and one or more of the other Debtors.[80]  Thus, they may hold claims against multiple Debtors, requiring the filing of multiple proofs of claim as long as the cases are separate. Substantive consolidation will cut through the confusion and eliminate the need for creditors to file proofs of claim in multiple cases. On a related note, substantive consolidation will streamline the administration of the estates by eliminating the need for the T-F Inc. Trustee to determine whether creditors were really creditors of T-F Inc. or were in fact creditors of T-F Manufacturing or one of the other Debtors.

80.     Notwithstanding which case they were scheduled in, all of the creditors dealt with T-F Inc. employees and were paid by T-F Inc.  The separate existence of these companies was a mere fiction.  It is fundamentally unfair that some creditors are relegated to T-F Manufacturing while the rest are in the case with the only apparent unencumbered cash.  This is especially true considering that some of the scheduled creditors of T-F Inc. (such as Airgas, Vortex and Uline) provided goods and services to T-F Manufacturing.  There is no justification for similarly situated creditors who provided goods and services to T-F Manufacturing to be segregated into separate cases. While the unsecured creditors of T-F Manufacturing may somewhat dilute T-F Inc.'s pool of unsecured creditors, the interests of fairness and equity demand substantive consolidation.

### VI.     REQUEST THAT THE COURT TAKE JUDICIAL NOTICE

---

[80] *See*, *e.g.*, Vortex, and Uline, both of which shipped goods to both T-F Manufacturing at the Arkansas Real Property and to T-F Inc.'s Benicia, California location. Exhibits 21 and 22.

81.     In accordance with Federal Rule of Evidence 201(c)(2), CFC respectfully requests that the Court take judicial notice of the following:

- Exhibits 1 through 5 (the Schedules of Assets and Liabilities and Statements of Financial Affairs filed by each of the Debtors);

- Exhibits 6 through 8 (pages from www.therma-flite.com);

- Exhibits 9 through 12 (the Debtors' brochures available on their website);

- Exhibit 16 (Mortgage recorded April 30, 2015, as instrument no. 2015R003300 in the records of Union County, Arkansas);

- Exhibit 17 (Proof of Claim no. 5, filed by AEDC in case no. 16-33469);

- Exhibit 20 (Proof of Claim no. 1, filed by Airgas USA, LLC in case no. 16-33469);

- Exhibit 21 (Proof of Claim no. 9, filed by Salina Vortex Corporation in case no. 16-33469);

- Exhibit 22 (Proof of Claim no. 11, filed by Uline Shipping Services in case no. 16-33469);

- Exhibit 23 (Motion to Abandon Personal Property, filed as Docket no. 48 in case no. 16-33470);

- Exhibit 24 (press release, dated April 2, 2014, entitled "Therma-Flite Expansion in El Dorado, Arkansas Changes Economic Climate" found at www.prnewswire.com/news-releases/therma-flite-expansion-in-el-dorado-arkansas-changes-economic-climate-253541401).

82.     Pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of adjudicative facts that are either (1) generally known within the Court's territorial jurisdiction; or (2) capable of accurate and ready determination from sources whose accuracy cannot be questioned. Fed.R.Evid. 201(b).  The Court may take judicial notice of the existence of filings in the Court's records and that parties took certain positions without determining the truth of the matter contained therein. *Manix Energy Ltd. V. James (In re James)*, 300 B.R. 890, 895 (Bankr. W.D. Tex. 2003) ("This Court is well aware that judicial notice can be taken as to the existence

of documents, such as proofs of claim or a debtor's schedules without inquiring whether the information contained in them is true"); *In re American Solar King Corp.*, 90 B.R. 808, 829, fn. 41 (Bankr. W.D. Tex. 1988) (taking judicial notice of the proofs of claim and schedules, noting that whether the information contained in them was true was immaterial to the Court's inquiry); *Center Operating Co., L.P. v. Base Holdings, LLC (In re Base Holdings, LLC)*, 2014 U.S. Dist. LEXIS 27914*6, fn.5 (N.D. Tex. 2014) (noting that the Court could take judicial notice of the occurrence of filings and positions taken in filings); *Smith v. CitiMortgage, Inc. (In re Smith)*, 2012 Bankr. LEXIS 1395*5-6 (Bankr. W.D. Tex. 2012) ("there is a difference between a request to take judicial notice of allegations contained in a court filing and a request to take judicial notice of the fact that certain allegations were made. The court cannot take judicial notice of the allegations for their truth . . . . The court may, however, take judicial notice of the fact that certain allegations were made . . . ."); *Reneker v. Offill*, 2012 U.S. Dist. LEXIS 83017*49 (N.D. Tex. 2012) (taking judicial notice "of the *existence*, but not the *truth*, of the occurrences and positions taken" in a prior action) (emphasis in original); *Wald v. Wald*, 2012 Bankr. LEXIS 2989*22 (Bankr. W.D. Tex. 2012) (*citing In re FedEx Ground Package System, Inc.*, 2010 U.S. Dist. LEXIS 30303*10 (N.D. Ind. 2010)); *In re FedEx Ground Package System, Inc.*, 2010 U.S. Dist. LEXIS 30303*10 (N.D. Ind. 2010) ("Court documents from another case may be used to show that the document was filed, that party took a certain position, and that certain judicial findings, allegations or admissions were made"). Similarly, the Court may take judicial notice that a website presented certain information to the public.  *In re Zuniga*, 332 B.R. 760, 784, fn. 26 (Bankr. S.D. Tex. 2005) (taking judicial notice of information presented to the public on firm websites).  CFC's identified exhibits are presented to the Court for the purpose of demonstrating

their existence and that certain statements were made therein, and accordingly are appropriate subjects for judicial notice.

## VII.    CONCLUSION

WHEREFORE, PREMISES CONSIDERED, CFC respectfully requests that this Court substantially consolidate the estates of the Debtors into the estate of Therma-Flite, Inc., Case No. 16-33469, and grant such other relief as may be necessary and appropriate.

RESPECTFULLY SUBMITTED this 21 day of October 2016,

**GLAST, PHILLIPS & MURRAY, P.C.,**

By:    _/s/ Jonathan L. Howell_
      Jonathan L. Howell, PLLC
      Texas Bar No. 24053668
      jhowell@gpm-law.com

      14801 Quorum Drive, Suite 500
      Dallas, Texas 75254
      Telephone: (972) 419-7196
      Facsimile: (972) 419-7839

**ATTORNEYS FOR CFC, INC.**